

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable O. P. Lockhart, Chairman
Board of Insurance Commissioners
Austin, Texas

Dear Sir:

Opinion No. 0-4255
Re: Do the plans of operation of
large metropolitan newspapers
in promoting increased cir-
culation through the medium
of sponsoring to readers and
subscribers a limited policy
of accident insurance at re-
duced rates constitute a viola-
tion of any applicable provi-
sions of the Texas statutes,
and related questions.

Your letter requesting an opinion of this department
on the questions stated therein reads as follows:

"In past years there has grown up a rather ex-
tensive custom among the larger metropolitan news-
papers of Texas of promoting increased circulation
through the medium of sponsoring and issuing, to
their subscribers only, a limited policy of accident
insurance at reduced rates. The instances which
have been called to our attention specifically and
officially are: (1) The San Antonio Light, (2) The
Dallas News, (3) The Houston Post, (4) The Houston
Chronicle. The San Antonio Light has not yet issued
any policies but has only launched its advertising
campaign; the other three have been in full-fledged
operation for a good many years.

"There is some question in our minds as to the
legality of the various plans of operation follow-
ed or proposed. There has also been complaint to
us from competitive companies and agencies; but we
give no controlling weight to this, since our sole

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

duty is to see that the laws as enacted by the Leg-
islature are observed; and our only interest, there-
fore, is in detecting and remedying violations.

"There are some variations in the plans propos-
ed or followed, now and in the past, by the various
newspapers; but in order that we may determine from
one-opinion from your Department whether any of such
plans or any part or parts thereof separately consider-
ed constitute violations of the law, we summarize and
number separately herein below all of the essential
features; and you may assume that all of them are com-
mon to all enterprises unless a limitation to the
contrary is indicated:

"1. The publishers of all of the news-
papers involved are private corporations.

"2. The companies issuing the policies
are duly licensed accident insurance companies.

"3. The policy forms, endorsements, and
riders used are duly approved by this Board.

"4. In each instance the newspaper publish-
er (corporation) enters into written or verbal express
or tacit contractual relations with the insurance com-
pany for the circulation-promotion and policy-market-
ing enterprise herein indicated.

"5. In each instance, except the Dallas
News, there is maintained in office quarters provid-
ed by the newspaper corporation a so-called registrar
who is a duly authorized agent licensed by this Board
in compliance with Article 5068b, and there are also
numerous duly appointed and licensed solicitors work-
ing under and in conjunction with the registrar. In
the case of the Dallas News, the insurance company
pays to the registrar a flat sum per month, out of
which he pays the Dallas News (A. H. Belo Corporation)
$45.00 per month rent for office space, and his own
help and office expense with the exception of adver-
tising and services of the Dallas News route carriers
mentioned hereinafter in paragraphs 19 and 20.

Honorable O. P. Lockhart, page 3

"6. With the modification above indicated as to the Dallas News, the newspaper provides at its own expense for the registrar and his staff of solicitors, office space, furniture, equipment, stationery, supplies, cards, postage, etc. Besides, at its own expense, the publishers furnish extensive newspaper layouts periodically or sporadically (sometimes running full page, sometimes one-half page or less) advertising the merits and desirability of the limited accident policy offered. In every case the total cost to the newspaper is quite substantial, but the newspaper apparently considers that it is amply compensated by the circulation increase and stability and the good will built up through the enterprise.

"7. In some cases, we have found this newspaper advertising somewhat misleading and misrepresentative as to the terms, merits, and benefits of the policy; but we ask for no opinion upon this feature, believing that your opinion as to the other points involved will enable us to dispose of and control this feature along with others in accordance with the law, Art. 5052, etc.

"8. In some instances the registrar and solicitors are full time, salaried employees employed and paid by the newspaper but devoting full time or a substantial portion of their time to the insurance business at the direction of the paper.

"9. In other instances it is probably that such registrar and solicitors are independent contractors with the newspaper or are agents of the insurance company or independent contractors with it.

"10. The newspaper advertising contains in most instances a coupon form, designed to be mailed or otherwise delivered to the newspaper to the attention of its 'Insurance Department', indicating that the person whose name, address, and other personal details are indicated in the coupon is interested in obtaining one of the policies offered.

"11. In other instances the newspaper advertising, instead of containing a mere coupon for inquiry,

contains an actual application for policies, to be mailed or otherwise returned to the 'Insurance Department' of the newspaper.

"12. Without exception, so far as we have observed, it is stated prominently and specifically in the newspaper advertising, the coupon or the application (but not in the policy), that the policy is available only to subscribers of the newspaper and to the members of their immediate family only so long as they remain subscribers and that the policy may be terminated when the newspaper subscription ceases. In most cases the policy itself provides that it contains the whole contract between insurer and insured and that neither the application nor any statement made by the assured shall be available as a defense or admissible in evidence. On the Dallas News policy, there is printed, 'Issued to readers of The Dallas Morning News.'

"13. The premiums charged for these policies usually include a twenty-five cent initial registration fee and a premium ranging from $1.20 (San Antonio Light) to $3.60 (other three) per year; these premiums being, we believe (especially the San Antonio Light), substantially lower than similar policies could be purchased (if at all) from other competing companies or agencies in the community; probably due, at least in part, (1) to the fact that the newspaper is bearing a substantial part of the total cost of insurance, and (2) in part to the fact that the insurance companies can afford to sell cheaper in the larger volume made possible through such an arrangement than they could by marketing through regular agencies not having the additional benefits furnished by the newspaper. In at least one instance (San Antonio Light) duly authorized representatives of the insurance company (North American Accident Insurance Company) have admitted specifically that the company could not and would not sell the same policy at the same price to any one other than subscribers to the newspaper, giving (2) above as the reason.

"14. In most instances the inquiry coupons or application forms published in the newspaper layouts are mailed by the inquirers or applicants directly to the registrar, usually addressed in care of the 'Insurance Department' of the newspaper.

"15. In other instances these inquiries or application forms have been picked up from the subscribers and transmitted to the registrar by the newspaper route carriers, who are in every instance not licensed as insurance agents or solicitors, and who are paid employees of or independent contractors with the newspaper.

"16. In most instances upon receipt by the registrar of the inquirer's coupon, the registrar sends a duly licensed solicitor to interview the prospect, take and return applications for policies; the applications then being passed upon and the policies refused or countersigned and issued by the registrar and mailed to the assured or beneficiary.

"17. In most instances the registration fees and commissions allowed by the insurance companies are paid to the licensed registrar and solicitors, either as their sole compensation or in addition to their regular salaries or other compensation as employees of or independent contractors with the publishers.

"18. In other instances such commissions and registration fees, or portions thereof, are retained by the publishers as a partial offset against expenses.

"19. In the case of the Dallas News the premiums are permitted to be collected periodically by newspaper route carriers who are not licensed and who are employees of or independent contractors with the newspaper.

"20. In such instances (Dallas News) as the newspaper route carriers are permitted to perform any function in the insurance enterprise, such as collection and transmission of applications, premiums, or

policies, it is stipulated in the application or
coupon-form that in so doing the newspaper route car-
rier is the agent of the newspaper subscriber, in-
quirer, or applicant and not of the newspaper or of
the insurance company (a provision of which we grave-
ly doubt the validity in view of the provisions of
the statutes, more especially Articles 5056 and 5063).

"21. In a few cases the registrar, in most
the publisher, remits to the insurance companies their
share of the premiums, and in every case the newspaper
is held responsible therefor.

"Please give us your opinion as to whether each
phase of the above mentioned plans of operation, con-
sidered separately or in conjunction with others, con-
stitutes a violation of any applicable provision of
our insurance statutes. Specify separately so we will
know which phases are legal and which are illegal.

"Most particularly we invite your attention to
the provisions of: R.C.S., Article 5053 and P.C., Arti-
cle 578; R.C.S., Articles 5055, 5056, 5058-5068, inclu-
sive, and P. C. Articles 568-573 and 570a.

"Particularly it seems to us that from the pro-
visions of the above cited statutes the legislature
intended that all persons who are not duly licensed
agents or solicitors (and particularly all corpora-
tions, which are specifically forbidden to be licensed
as agents or solicitors of insurance) should keep hands-
off the insurance business strictly, and that parti-
cularly under Articles 5055-5068b, inclusive, the news-
paper corporations are unlawfully carrying on the busi-
ness of soliciting and receiving applications for in-
surance, issuing and delivering policies thereof, and
otherwise aiding 'in the transaction of the business
of any insurance company,' and doing at least indirect-
ly through actual control of others those things which
they are most specifically and emphatically forbidden
to do directly themselves; and that their employees
and independent contractors and the insurance compan-
ies and their agents, employees, and independent con-
tractors are likewise violating one or more of the pro-
visions of the cited statutes. It seems to us plain,

also that in offering these policies (1) only to sub-
scribers of the newspapers and denying them to others
of equal insurability, and (2) at rates lower than non-
subscribers to the particular newspapers can purchase
policies elsewhere, the insurance companies and their
agents, employees, and independent contractors are
guilty of discriminating and rebating in violation
of statutory provisions."

The contracts between the insurance companies and the
newspaper publishers, above mentioned, now in force, are to be
executed and put in force as reflected by the photostatic copies
of the same accompanying your inquiry are as follows:  The agree-
ment or contract between the Inter-Ocean Casualty Company and the
A. H. Belo Corporation is as follows:

"THE STATE OF TEXAS

COUNTY OF DALLAS

"THIS AGREEMENT made and entered into this the
2nd day of March, A.D. 1938, by and between INTER-
OCEAN CASUALTY COMPANY, a corporation organized un-
der the laws of the State of Indiana, with executive
offices in Cincinnati, Ohio, and having a permit to
do business in Texas, hereinafter called 'Inter-Ocean,'
and A. H. BELO CORPORATION, a Texas corporation with
its domicile in Dallas, Texas, hereinafter designated
as 'Publisher.'

"WITNESSETH

"That WHEREAS, the protective benefits of desir-
able accident insurance are not conveniently obtain-
able by the readers of and subscribers to newspapers
of the Publisher upon small weekly payments for such
character of insurance; and,

"WHEREAS, it is mutually considered by the par-
ties hereto that an opportunity for such readers and
subscribers of the newspapers of the Publisher to buy
such character of accident insurance upon premiums
payable weekly would not only be conducive to their
welfare but would also increase the business of said
Inter-Ocean and increase the circulation of the news-
papers of the Publisher, and likewise would increase

the sale and subscription to said newspapers to the advantage of Publisher's independent contractor newspaper carriers through their voluntary efforts to so increase the subscription sale of said newspapers; and,

"WHEREAS, said Inter-Ocean has submitted to Publisher specimen copies of policies, two of which are to be identical in terms with policy forms hereto attached as a part hereof, each stamped 'Specimen Policy,' and marked in ink respectively, one '133-DM' and the other '133 DMC,' each of which policies it undertakes to issue and sell for the premium of five cents per week; also printed form of policy by said Inter-Ocean with the various changes and additions thereto indicated by ink thereon and by addenda pasted to said policy, and which form of policy is marked in ink on first page thereof '133 DM 7,' which policy said Inter-Ocean undertakes to issue and sell at a premium of seven cents per week, and said policy is hereto attached as a part hereof; and said Inter-Ocean assures Publishers that it is authorized by the Insurance Commissioner of the State of Texas to issue and sell said insurance upon the terms and obligations reflected in each of the form policies attached hereto, and will furnish to Publisher certificate of such authorization from said Commissioner as condition precedent to this contract agreement.

"NOW, THEREFORE, for and in consideration of the covenants and agreements herein contained, to be kept and performed by the parties hereto, it is mutually agreed as follows:

"1. That Publisher consents that the voluntary service and efforts of its said independent contractor newspaper carriers may be enlisted in the promotion of said business of said Inter-Ocean, conditioned that they do so voluntarily for the purpose of increasing their newspaper sales and thereby further their own interest and increased earnings to them thereby.

"2. The Publisher agrees to sponsor by advertisements in its daily newspapers the said policies of insurance, forms of which are made a part hereof, so that information as to the benefits thereof and premiums to be paid therefor shall be available to the readers of and subscribers to its newspapers.

"3. The Publisher agrees to devote a reasonable amount of newspaper space to advertising the insurance plan and to furnish Inter-Ocean's Dallas Registrar at least one copy daily of its newspaper 'The Dallas Morning News' during the existence of this agreement, without expense to Inter-Ocean. Inter-Ocean shall have the right to require the Publisher to immediately discontinue, withdraw or amend the form or subject matter of any of the advertisements or announcements in connection with the insurance plan. However, no publication shall be made without the approval of Publisher.

"4. Inter-Ocean shall provide its duly accredited and authorized Registrar, resident in and with convenient office in Dallas, Texas, for the transaction of its business in relation to said insurance business that may flow from the readers of and subscribers to said newspapers.

"5. Inter-Ocean shall provide its duly licensed agent, authorized to furnish to those designated above in paragraph 1 hereof such printed forms of application for insurance as Inter-Ocean may provide for such newspaper subscribers aforesaid, and if and when signed by such newspaper subscribers, to receive same, and after listed by the Depository hereinafter designated, to transmit same to the Registrar, and said Registrar, if same be in proper and legal form, shall at once issue the policy of insurance called for therein; and said agent and Registrar shall then promptly provide for the delivery of said policy to the assured therein.

"6. Inter-Ocean hereby constitutes Publisher its Depository to receive, collect and account to it for all premiums realized from said newspaper subscribers and readers upon said policies of insurance so procured under the sponsorship of Publisher aforesaid. And it being understood that such policies shall only be issued by Inter-Ocean upon applications therefor, and such policies to be canceled by Inter-Ocean for nonpayment of premium as provided in said respective policies of insurance, the Publisher agrees to act as such Depository and to receive and account to Inter-Ocean for all premiums so turned over to it, and to keep a record of such sums and by what assured paid, and of such data as may be requisite to comply with

the obligations in this paragraph undertaken. And
further Publisher will account to Inter-Ocean for
all premiums upon such insurance policies paid by
such newspaper subscribers and readers where such
policies are rightfully in force hereunder. That
there shall be paid by Inter-Ocean to Publisher as
compensation for its newspaper advertisements afore-
said and for its services under this agreement a sum
equal to one-half of one cent upon the weekly prem-
iums of five cents per week upon the premiums paid by
said newspaper subscribers and readers for policies
referred to herein as '133-DM' and '133 DEC' respec-
tively, and a sum equal to two cents upon the weekly
premiums paid by said newspaper subscribers and
readers for policies referred to herein as '133 DN 7'
less, however, from such gross amount to be paid
Publisher the sum of $53.30 per month shall be de-
ducted therefrom or paid in cash by Publisher to
Inter-Ocean at Dallas, Texas, this sum being the
amount agreed upon between the parties hereto as
adjusting and determining the compensation to Pub-
lisher. The Publisher, in any accounting with Inter-
Ocean, shall retain its aforesaid compensation from
the sum that may be held for or due to Inter-Ocean
by said Depository, and which accounting by Pub-
lisher shall begin May 10th, 1938, and be made
monthly thereafter during the life of this contract.

"7. Inter-Ocean shall issue to such readers
and subscribers of the daily newspapers published
by the Publisher its certain Newspaper, Travel and
Pedestrian Accident policies, in accordance with
the respective forms, copies of which are attached
hereto, the issuance of which has been or will be
authorized and approved by the Insurance Department
of the State of Texas.

"8. Immediately upon receipt of an applica-
tion for such insurance policy from the subscribers
or readers of such newspapers by the said licensed
agent mentioned in paragraph 5 hereof, he shall de-
liver to the Registrar, or other duly authorized
agent of Inter-Ocean to be named by Inter-Ocean, such
application and a schedule, in duplicate, upon forms
to be furnished by Inter-Ocean, which schedule shall
show the name, address and age, together with an

identifying number, of each person who has made appli-
cation for a policy of insurance. Thereupon, the Reg-
istrar, or other duly authorized agent of Inter-Ocean
shall, as soon as may reasonably be possible, counter-
sign and issue policies of insurance to the persons
who have applied and are eligible therefor, as appears
from such schedule. Delivery of the policies of in-
surance shall then be made to the assureds, subscribers,
or readers of said newspapers aforesaid. The provi-
sions and conditions in such policies of insurance
contained shall at all times determine the liability
of Inter-Ocean to such policy-holders.

"9. The Registrar shall furnish weekly to the
Publisher and Inter-Ocean a duplicate list of all
policies issued during the previous week, on forms to
be furnished by Inter-Ocean, together with a list of
all policyholders whose policies have ceased to be in
force, either by cancellation or on account of non-
payment of premiums as required by said policy.

"10. Inter-ocean agrees that during the contin-
uance of this agreement it will not accept insurance
upon any form of Newspaper, Travel and Pedestrian Acci-
dent policy from any other newspaper, magazine or
periodical printed and published in the City of Dallas,
Dallas County, Texas, and will not issue any such
policies of insurance to the subscribers or readers
of any other newspaper, magazine or periodical which
is printed or published within the City of Dallas,
Dallas County, Texas. The Publisher agrees that dur-
ing the continuance of this agreement it will not main-
tain any contract or enter into any contract with any
other insurer for the issuance of a similar form of
accident insurance policy to any of its subscribers
or readers.

"11. This contract shall be continuous until
canceled by either party giving thirty (30) days'
prior written notice to the other party.

"12. During the continuance of this contract
Inter-Ocean shall at reasonable times be permitted to
audit the policy records of the Publisher, Depository
aforesaid, in order to reconcile any inaccuracies or
differences, should any such inaccuracies or differ-
ences occur.

"13. The Publisher agrees promptly to report to Inter-Ocean all claims arising under any policy which may be issued by Inter-Ocean under the terms of this agreement that may come to its notice or attention, and promptly to transmit information as to such to the Registrar or other authorized agent of Inter-Ocean, together with all reports, communications and other information, or copies thereof, that may be received by it relating to claims presented or to be made under said insurance policies. Inter-Ocean agrees promptly to investigate and dispose of all claims in accordance with the terms of said policies and to pay or reject claims in accordance with the merits, as shown by the proofs and the facts.

"14. Inter-Ocean agrees to maintain Excess Catastrophe Reinsurance similar to the coverage set out in Policy No. R2245 issued by Lloyds, London, to Inter-Ocean Casualty Company, which policy is now in full force and effect, or to notify the Publisher immediately upon the termination of such Excess Catastrophe Reinsurance.

"15. Inter-Ocean further agrees to pay to the Publisher Three Hundred ($300.00) Dollars on or before April 1, 1938, to assist in defraying the Publisher's initial expense incident to the insurance plan provided herein.

"16. The effective date of this contract shall be April 1, 1938, at 12:01 a.m., Central Standard Time.

"IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed in duplicate originals by its duly authorized officers or representatives on the day and year first above written.

A. H. BELO CORPORATION

By /s/ E. H. Dealey

WITNESS:

/s/ J.M. Moroney

WITNESS:

/s/ E. C. Kearns "

INTER-OCEAN CASUALTY COMPANY

By /s/ J.W. Schorr, President

Honorable O. P. Lockhart, page 13

"Cincinnati, Ohio
April 29, 1938

"A. H. Belo Corporation
Dallas, Texas.

"Gentlemen:

"In the contract between Inter-Ocean Casualty Company and A. H. Belo Corporation, of date March 2, 1938, Clause 6 thereof should be modified and changed as follows:

"By mutual consent of the parties hereto and upon consideration therefor, Clause 6 of said above contract is modified and changed so that $328.42 per month is substituted for and in place of $53.30 per month recited in said Clause 6 of said contract, and so modified and changed said Clause 6 of said contract is confirmed.

"This letter is signed in duplicate by us, and when likewise so signed by you, it shall constitute a part of said contract in modification of Clause 6 thereof as here written.

Yours very truly,

INTER-OCEAN CASUALTY COMPANY

By /s/ J. W. Schorr
President

AGREED TO:

A. H. BELO CORPORATION

By /s/ J. M. Moroney
Secy.-Treas."

The contract or agreement between The Houston Printing Corporation and the North American Accident Insurance Company is as follows:

"This agreement made and entered into this fif-
teenth day of July, 1938, by and between THE HOUSTON
PRINTING CORPORATION, of Houston, Texas, hereinafter
referred to as the first party, and the NORTH AMERI-
CAN ACCIDENT INSURANCE COMPANY of Chicago, Illinois,
hereinafter referred to as the second party.

"WITNESSETH: That the first party is desirous
of acting as agent of the second party in selling a
certain policy or policies, known as the Series 397A
to the readers and subscribers of the publication
known as the HOUSTON POST, within State of Texas, and

"That the second party is engaged in the busi-
ness of insurance and licensed to issue in the State
of Texas such particular policy or policies of in-
surance.

"NOW, THEREFORE, in consideration of the cove-
nants and agreements herein set forth, to be kept and
performed by the parties hereto, the second party
agrees to issue the policy herein described, or any
policy that may be by an agreement in writing substi-
tuted therefor, to those readers and subscribers of
the publication who shall make application for such
policy and who reside within the territory aforesaid;
provided, however, there shall be no soliciting for
such policy outside the State of Texas, saving and ex-
cepting, however, that the present subscribers of the
publication who are residents of other states may se-
cure such policy provided that in every case the ap-
plication for the policy of the second party comes
through and is taken by a person regularly authorized
by the Insurance Department of the state in which
such application is made if the law of the state re-
quires such authorization. A copy of such policy is
hereto attached, and its conditions and provisions
shall at all times determine the liability of the
second party to such readers and subscribers.

"Said first party agrees within twenty-four (24)
hours after the receipt of such application to issue
to the applicant policy of the form herein mentioned,
such policy to be dated as to the date of issue, and

within twenty-four (24) hours from the date of issue of such policy to send to the second party the application therefor, upon which said application shall be noted the number of the policy issued to such reader or subscriber and the date of issue of such policy.

"Said party of the first part agrees to collect the full initial premium of 30 cents on all new policies issued from the 25th day of each month to the 24th day of the next succeeding month, both inclusive, and pay said initial premium on a net basis of 20.833 cents to said second party in Chicago, Illinois, on or before the first day of the following month.

"Said party of the first part agrees to report to the party of the second part in writing, on or before the 6th day of each week, the serial number, name and address of the assured of all policies lapsed for non-payment of the monthly premium thereon. Policies so reported shall not be included in the bill to be rendered the party of the first part by the party of the second part covering advance renewal premiums for the following month. It is hereby understood that on all policies issued, the first month's premium will be guaranteed to the party of the second part. Weekly credit for cancellations will begin after the first four weeks.

"On all policies to be renewed the party of the first part agrees to collect the full advance monthly renewal premium of 30 cents on all policies in force on the 25th day of each and every month and to pay said advance monthly premium on a net basis, as stated in another paragraph in this contract, to said second party in Chicago, Illinois, on or before the first day of the following month.

"In event of failure or default of either party hereto, in the performance of any of the material obligations imposed by this agreement, the other party may terminate this agreement by giving thirty (30) days' notice in writing mailed to the party in default; but such termination shall not affect insurance already in force.

"In case of misrepresentation as to the nature
or coverage under such policies by said first party
or his sub-agents, then this contract and all rights
thereunder shall be forfeited and void.

"Said first party agrees to promptly transmit
to the second party immediately after receipt there-
of, all reports, communications, or other informa-
tion received by him relating to claims presented or
any other matter in which said second party may be
interested; and to interpose no difficulties to the
thorough investigation and equitable adjustment of
each and every claim.

"Said second party agreed to promptly investigate
and dispose of all claims according to the merits as
shown by the proofs and the facts.

"The first party and all representatives soli-
citing applications shall at all times be licensed
by the proper state authority, the cost of such li-
cense and also the expense incident to the issue and
delivery of such policies to be borne by the first
party.

"This agreement is made subject to the condi-
tion, that the second party shall continue to be li-
censed to do business in this territory now or here-
after covered by this agreement and shall have the
legal right to carry out the provisions hereof.

"Said party of the first part also agrees to
mail to the Newspaper Department of the North Ameri-
can Accident Insurance Company copies of all advertis-
ing which may be used in the promotion of circulation
in connection with the aforesaid policy.

"The term of this agreement shall be one (1)
year from its date and shall automatically renew un-
less thirty (30) days notice in writing is given by
either party of intent to cancel.

"IN WITNESS WHEREOF, the said first party has
hereunder set his hand, and the said second party has

caused these presents to be executed in duplicate
by E. P. Gore, Manager of the Special Newspaper
Travel Policy Department, or by an officer of said
second party, this 15th day of July, 1935.

NORTH AMERICAN ACCIDENT INSURANCE
COMPANY

By  /s/ E. P. Gore

THE HOUSTON PRINTING CORPORATION

By /s/ W. P. Hobby "

The agreement or contract between The Houston Chronicle
Publishing Company and the Washington National Insurance Company
is as follows:

"AGREEMENT

"WHEREAS, THE HOUSTON CHRONICLE PUBLISHING
COMPANY, a corporation organized under and by virtue
of the laws of the State of Texas and maintaining its
principal place of business in Houston, Harris County,
Texas, (hereinafter referred to as 'PUBLISHER') and
WASHINGTON NATIONAL INSURANCE COMPANY, a corporation,
organized under the laws of the State of Illinois,
(hereinafter referred to as 'INSURER'), did on Jan-
uary 20, 1939, enter into a certain written agree-
ment, pertaining to the purchase, sale and issuance
of certain 'newspaper reader insurance policies'
(hereinafter referred to as 'READER INSURANCE') and
which agreement provided that the same should remain
in force and effect for a period of five (5) years
from the date thereof; and,

"WHEREAS, PUBLISHER and INSURER desire to in
all things mutually cancel, void and hold for naught
said written contract aforesaid and any or all sup-
plements thereto and to enter into a new written con-
tract; and,

"WHEREAS, INSURER is engaged in the business of insurance and duly licensed to do business in the State of Texas; and

"WHEREAS, PUBLISHER is desirous of having available to the readers and subscribers of its publication, to-wit, The Houston Chronicle, READER INSURANCE; and,

"WHEREAS, certain of the readers and subscribers of PUBLISHER'S publication, The Houston Chronicle, are at the present time policyholders of READER INSUR-ANCE heretofore issued by INSURER; and,

"WHEREAS, INSURER desires to issue to the readers and subscribers of PUBLISHER'S publication, to-wit, The Houston Chronicle, as may desire to buy, READER INSURANCE, conditioned and provided that said readers and subscribers are eligible to become policyholders of said READER INSURANCE, and INSURER is further willing and desirous of renewing all of those certain READER INSURANCE now in force and heretofore issued by INSURER to the readers and subscribers of PUBLISH-ER'S publication, to-wit, The Houston Chronicle.

"NOW, THEREFORE, in consideration of the mutual covenants, benefits and agreements herein contained, PUBLISHER and INSURER do agree as follows:

1.

"That that certain contract, dated January 20, 1939, and all supplements, if any, thereto, between PUBLISHER and INSURER be in all things mutually cancelled, annulled and held for naught.

2.

"INSURER agrees to issue its said READER INSUR-ANCE to all of the readers and subscribers of the publication or publications published by the PUBLISH-ER (the present publication being The Houston Chronicle), conditioned only that the readers and subscribers aforesaid come within the terms, conditions and limitations prescribed by the READER INSURANCE policies, a copy of which is attached hereto and made a

part hereof, and who make proper application for said READER INSURANCE upon duly prescribed application blanks to be furnished by INSURER for that purpose.

"INSURER agrees, effective March 25, 1941, to collect all premiums therefor and to issue and deliver said READER INSURANCE and to collect all future premiums due upon said READER INSURANCE now in force and to pay every expense of any nature whatsoever in connection therewith, including, but not by way of limitation, the expense of issuing and delivering the policies; the expense of collecting the premiums; the expense of soliciting and selling the READER INSURANCE; all salaries, commissions, bonuses, social security taxes of any kind, whether State or Federal; and all expense of any litigation, including settlements and judgment, growing out of or in any way connected with the sale, issuance or delivery of said READER INSURANCE policy.

3.

"INSURER further covenants, contracts and agrees, effective as of March 25, 1941, to handle all of the renewals and collections of all premiums now due or that may become due upon any READER INSURANCE now outstanding which READER INSURANCE HAS heretofore been issued by INSURER under and by virtue of the provisions of the agreement between PUBLISHER and INSURER dated January 20, 1939.

"In this connection, INSURER covenants and agrees effective March 25, 1941, to pay every expense of any nature whatsoever in connection therewith, including, but not by way of limitation, the expense of renewing and re-issuing or redelivery of any policy, the expense of collecting, the renewals, the renewal premiums and expense of servicing renewals of said policies, all salaries, commissions, bonuses, social security taxes, and insurance taxes, whether State or Federal, and all expenses of any litigation (including settlements and judgments) growing out of or in any way connected with the renewal or re-issuance of said READER INSURANCE.

4.

"The READER INSURANCE which INSURER agrees to
issue to the readers and subscribers of the publica-
tion or publications printed by PUBLISHER shall be
known as FORM NA 351, a copy of which is attached
hereto and made a part hereof.

"In the event INSURER desires to change the form
of READER INSURANCE, the proposed change must first
be submitted to PUBLISHER and PUBLISHER'S written ap-
proval thereof obtained.

5.

"On all READER INSURANCE now in force and ef-
fect which have heretofore been issued in accordance
with the written contract between PUBLISHER and IN-
SURER dated January 20, 1939, on which policies the
premiums have been paid in advance of March 24, 1941,
to PUBLISHER, PUBLISHER will immediately upon the
execution hereof pay to INSURER all of INSURER'S
pro rate net premiums as provided in the contract
between INSURER and PUBLISHER dated January 20, 1939.
Attached hereto and made a part hereof is a list of
the policies on which the premiums have been paid
in advance.

6.

"INSURER agrees to employ at its sole expense
competent solicitors to sell READER INSURANCE to the
readers and subscribers of The Houston Chronicle.

7.

"PUBLISHER is to deliver and turn over to IN-
SURER upon the execution hereof all of the insur-
ance records, files, application blanks, and all other
records pertaining to any READER INSURANCE now in
force and effect, including the Speedaumat plates
upon which are imprinted the names of the policy-
holders and the policy information. PUBLISHER, dur-
ing the life of this contract, will further permit

"INSURER the free use of the Speedaumat, typewriters, and other mechanical equipment now in use in connection with the issuing, collecting and handling of said insurance policies and all of such other business pertaining thereto.

"PUBLISHER further agrees, during the existence of this contract, to furnish free of charge to INSURER the present office space as now occupied by the Insurance Department on the main floor of the Chronicle Building, located at the intersection of Texas Avenue and Travis Street in Houston, Harris County, Texas, and, in this connection, PUBLISHER will furnish free of charge to INSURER light, heat, telephones, telephone service and the furniture and fixtures and all of the office equipment now being used in connection with the handling and carrying on of the business in connection with said READER INSURANCE.

"PUBLISHER further agrees to sponsor the plans of effecting insurance on its readers and subscribers and in connection therewith said PUBLISHER will publish at its own expense in its daily or Sunday newspaper publication, known as The Houston Chronicle, a minimum of FOUR HUNDRED AND EIGHTY (480) INCHES monthly of advertising relating to the insurance plan and program, the insertion dates and size of copy to be at the discretion of the PUBLISHER. Beginning with the 25th day of each calendar month up to and including the first day of the next succeeding calendar month, PUBLISHER will also at its own expense allow out of the four hundred and eighty (480) inches aforesaid the publication of at least TWO HUNDRED (200) INCHES devoted to the renewal of said READER INSURANCE.

"PUBLISHER further agrees to publish at its own expense in the said newspaper known as The Houston Chronicle at least ONE (1) full page advertisement and TWO (2) one-half page advertisements announcing the change in the method of collecting the premiums from the carriers to the method prescribed by INSURER.

8.

"This agreement shall continue and remain in force for a period of one (1) year from the effective date hereof, and shall thereafter continue in force and effect until cancelled by either party giving to the other SIXTY (60) days written notice of its intention to cancel the said agreement.

9.

"The effective date of this agreement shall be the 25th day of March, 1941, subject to the execution in writing by an executive officer of the INSURER and cannot be modified, renewed, or changed by any verbal promise or statement by whomsoever made and only by writing signed by one of the executive officers of INSURER.

10.

"It is distinctly agreed and understood between the parties hereto that this agreement and the operations of the parties hereto thereunder shall in no manner be construed as a co-partnership or a joint venture and that no acts of omission or commission by any of the officers, agents, servants or employees of either of the parties hereto shall be binding upon the other party hereto.

11.

"In the event of any claim or suit being filed against PUBLISHER by any person, firm or corporation growing out of or in any way relating to the soliciting, sale, issuing, cancellation, collection of premiums or renewal of any READER INSURANCE, PUBLISHER will immediately notify INSURER thereof and INSURER does hereby covenant, contract and agree to make all investigations, negotiations or settlements of such claims or suits as may be deemed expedient by INSURER and to pay all expenses incurred therewith and to defend any and all suits that may be brought against PUBLISHER, whether said suits are bona fide or not,

Honorable O. P. Lockhart, page 23

and in this connection INSURER does hereby covenant, contract and agree to pay on behalf of PUBLISHER all sums which PUBLISHER shall become obligated to pay by reason of any liability imposed upon it by law for damages arising out of the soliciting of, sale, issuance, collection of premiums or renewal of said READER INSURANCE, whether said claims or suits be based upon any transactions in the past, present or future.

"IN WITNESS WHEREOF, THE HOUSTON CHRONICLE PUBLISHING COMPANY has caused these presents to be executed in triplicate by its Business Manager, and WASHINGTON NATIONAL INSURANCE COMPANY has caused these presents to be executed by its President, this the 24th day of March, 1941.

THE HOUSTON CHRONICLE PUBLISHING COMPANY,

By /s/ J. T. Butler

PUBLISHER

ATTEST:

/s/ G. L. Minie

WASHINGTON NATIONAL INSURANCE COMPANY

By /s/ A. S. Kendall

INSURER

ATTEST:

_____ "

The agreement or contract between the San Antonio Light of San Antonio, Texas, and the North American Accident Insurance Company is as follows:

Honorable O. P. Lockhart, page 24

"THIS AGREEMENT made and entered into this 26th day of September 1941 by and between the San Antonio Light of San Antonio, Texas, hereinafter referred to as the first party, and the North American Accident Insurance Company of Chicago, Illinois, hereinafter referred to as the second party.

"WITNESSETH: That the first party is desirous of acting as agent of the second party in selling a certain policy or policies, known as Series 437-A to the readers and subscribers of the publication known as The San Antonio Light within the county of Bexar; and

"That the second party is engaged in the business of insurance and licensed to issue in the State of Texas such particular policy or policies of insurance.

"NOW, THEREFORE, in consideration of the covenants and agreements herein set forth, to be kept and performed by the parties hereto, the second party agrees to issue the policy herein described, or any policy that may be by an agreement in writing substituted therefore, to those readers and subscribers of the publication who shall make application for such policy and who reside within the territory aforesaid; provided, however, there shall be no soliciting for such policy outside the State of Texas, saving and excepting, however, that the present subscribers of the publication who are residents of other states may secure such policy, provided that in every case the application for the policy of the second party comes through and is taken by a person regularly authorized by the Insurance Department of the state in which such application is made if the law of the state requires such authorization. A copy of such policy is hereto attached, and its conditions and provisions shall at all times determine the liability of the second party to such readers and subscribers.

"Said first party agrees within twenty-four (24) hours after the receipt by him of such application to issue to the applicant policy of the form

herein mentioned, such policy to be dated as to the date of issue, and within twenty-four (24) hours from the date of issue of such policy to send to the second party the application therefor, upon which said application shall be noted the number of the policy issued to such reader or subscriber and the date of issue of such policy.

"Said first party agrees to collect the full premium of $1.20 from each insured and to pay to said second party at the office of its agents or to the said second party in Chicago, Illinois, the said premium for each policy issued by the second party under this agreement, said payments to be made on or before the tenth day of the month following the month during which said policies are issued.

"Said party of the first part also agrees to mail to the Newspaper Department of the North American Accident Insurance Company copies of all advertising which may be used in the promotion of circulation in connection with the aforesaid policy.

"The term of this agreement shall be one (1) year from its date and shall automatically renew unless thirty (30) days notice in writing is given by either party of intent to cancel.

"In the event of the renewal of this agreement, the first party may submit for renewal the names of any of the persons to whom the policies were originally issued, and the premium for the renewal of such policies for each term of one (1) year shall be $1.20.

"In event of failure or default of either party hereto, in the performance of any of the material obligations imposed by this agreement the other party may terminate this agreement by giving thirty (30) days' notice in writing mailed to the party in default; but such termination shall not affect insurance already in force.

"In case of misrepresentation as to the nature or coverage under such policies by said first party or his sub-agents, then this contract and all rights

thereunder shall be forfeited and void.

"Said first party agrees to promptly transmit to the second party immediately after receipt thereof, all reports, communications, or other information received by him relating to claims presented or any other matter in which said second party may be interested; and to interpose no difficulties to the thorough investigation and equitable adjustment of each and every claim.

"Said second party agrees to promptly investigate and dispose of all claims according to the merits as shown by the proofs and the facts.

"The first party and all representatives soliciting applications shall at all times be licensed by the proper state authority, the cost of such license and also the expense incident to the issue and delivery of such policies to be borne by the first party.

"Said first party may report for cancellation, within thirty (30) days of issue, any such policy, and such policy will be cancelled by written notice to such policy-holder, and credit in the amount of $1.10 for such policy shall be given to said first party.

"This agreement is made subject to the condition that the second party shall continue to be licensed to do business in the territory now or hereafter covered by this agreement and shall have the legal right to carry out the provisions hereof.

"IN WITNESS WHEREOF, the said first party has hereunder set his hand, and the said second party has caused these presents to be executed in duplicate, by _____, Manager of the Special Newspaper Travel Policy Department, or by an officer of said second party, this ____ day of January, 1941.

———————————————————

NORTH AMERICAN ACCIDENT INSURANCE COMPANY

By _____ "

You have submitted a number of questions in your inquiry, as shown above. However, we think that the first question to be determined is whether the newspapers involved which are private corporations are agents of the above named insurance companies. If the above named newspapers are agents of the heretofore named insurance companies it will not be necessary to answer or discuss the other questions submitted in your inquiry.

An insurance agent, so far as the insurer is concerned, is a person expressly or impliedly authorized to represent it in dealing with third persons in matters relating to insurance. (Couch on Insurance, Vol. 2, Sec. 456; Texas Jur., Vol. 24, p. 799.)

Article 5056, Vernon's Annotated Civil Statutes, provides in effect, that any person who solicits insurance on behalf of any insurance company, whether incorporated under the laws of this or any other state or foreign government, or who takes or transmits other than for himself any application for insurance or any policy of insurance to or from such company, or who advertises or otherwise gives notice that he will receive or transmit the same, or who shall receive or deliver a policy of insurance of any such company, or who shall examine or inspect any risk, or receive, or collect, or transmit any premium of insurance or make or forward any diagram of any building or buildings, or do or perform any other act or thing in the making or consummating of any contract of insurance for or with any such insurance company other than for himself, who shall examine into, or adjust or aid in adjusting any loss for or on behalf of any insurance company, whether any of such acts shall be done at the instance or request, or by the employment of such insurance company or of, or by any broker or other person, shall be held to be the agent of the company for which the act is done, or the risk is taken, as far as relates to all the liabilities, duties, requirements, and penalties set forth in the Chapter of which Article 5056, supra, is a part.

By the provisions of Article 5064, Vernon's Annotated Civil Statutes, no corporation or stock company can be granted a license to act as agent for life insurance.

Article 5068b, Vernon's Annotated Civil Statutes, is applicable regarding the licensing of agents for life insurance companies, accident insurance companies, life and accident,

health and accident, or life, health and accident insurance companies, or associations or organizations, local mutual aid associations, or statewide mutual associations, soliciting or writing insurance in the State of Texas as the term agent is defined by law.

Articles 5062a and 5062b, Vernon's Annotated Civil Statutes, are applicable regarding the licensing of agents other than life, health and accident, etc., as set forth in Article 5068b, supra. In Section 3 of both of the above mentioned statutes it is expressly provided, "The board shall not issue a license to a corporation."

Article 5055, Vernon's Annotated Civil Statutes, provides in effect that it shall not be lawful for any person to act within this state, as agent or otherwise in soliciting or receiving applications for insurance of any kind whatever or in any manner to aid in the transaction of the business of any insurance company incorporated in this state or out of it, without first procuring a certificate of authority from the commission. The Penal Code also provides that an unlicensed agent who shall solicit insurance shall be subject to a fine (Article 572, Vernon's Annotated Penal Code).

Article 568, Vernon's Annotated Penal Code, defines insurance agents in practically the same language as Article 5056, Vernon's Annotated Civil Statutes.

Article 570a, Vernon's Annotated Penal Code, provides in effect that any person who shall act as a life, health, or accident insurance agent without having first obtained a license as provided by law, or who shall solicit life, health or accident insurance or act as a life, health or accident agent without having been appointed or designated by some duly authorized life insurance company, accident insurance company, life and accident, health and accident, or life, health and accident insurance company, or association, or organization, local mutual aid association, or statewide mutual association to do so as provided by law, or any other person who shall solicit, life, health or accident insurance or act as agent for any person or insurance company or association not authorized to do business in Texas; or any officer or representative of any life insurance company, accident insurance company, life and accident, health and accident, or life, health and accident insurance company or

association, or organization, local mutual aid association, or statewide mutual association who does not have a valid and outstanding license, as provided by law shall be guilty of misdemeanor, and upon conviction, shall be fined any sum not exceeding $500.00 and shall be barred from receiving the license as an insurance agent for a period of at least two years.

Considering Articles 5062a and 5062b, supra, regulating the licensing of local recording agents and solicitors, together with Article 5064, Vernon's Annotated Civil Statutes, prohibiting corporations and stock companies from acting as agents for life insurance, it is apparent that a corporation cannot be licensed as an insurance agent in this state.

It will be noted that the agreement or contract between the Inter-Ocean Casualty Company and the A. H. Belo Corporation, that the insurance company constitutes the publisher its depository to receive, collect and account to it for all premiums realized from said newspaper subscribers and readers upon said policies of insurance so procured under the sponsorship of the publisher. It will be noted that the contract or agreement between the Houston Printing Corporation and the North American Accident Insurance Company that the publisher or printing corporation agrees within 24 hours after the receipt by it of such application to issue to the applicant a policy of the form mentioned, such policy to be dated as to the date of issue, and within 24 hours from the date of issuance of such policy to send to the second party the application therefor, upon which said application shall be noted the number of the policy issued to such reader or subscriber and the date of issue of such policy.

The publisher agrees to collect the full initial premium of thirty-cents on all new policies issued from the 25th day of each month to the 24th day of the next succeeding month, both inclusive, and pay said initial premium on a net basis of 20-833 cents to said second party in Chicago, Illinois, on or before the first day of the following month.

A similar provision is contained in the proposed agreement or contract between the San Antonio Light of San Antonio, Texas, and the North American Accident Insurance Company of Chicago.

Apparently the agreement or contract between the Houston Chronicle Publishing Company and the Washington National

Insurance Company contains no provision where the publisher will issue a policy or collect a premium thereon. However, the publisher agrees to sponsor the plan of effecting insurance on its readers and subscribers and in effect solicits insurance by the various advertisements required by the contract, for the Washington National Insurance Company.

Considering the definition of insurance agents as set forth in Article 5056, Vernon's Annotated Civil Statutes, and Article 568, Vernon's Annotated Penal Code, we think, that the above named publishers are agents of the various named insurance companies as the word "agent" is defined in these articles. And as above stated a corporation cannot be licensed as an insurance agent in this state. It is our further opinion that the above named publishing companies, except the San Antonio Light, which has not executed the above contract, all which are private corporations, are unlawfully acting as agents of the above named insurance companies.

We are returning herewith the photostatic copies of the above mentioned contracts in compliance with your request.

As it is our opinion that the above named publishing companies, except the San Antonio Light, are unlawfully acting as the agents of the heretofore named insurance companies, we do not think that it is necessary to pass upon the additional propositions contained in your inquiry.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By

Ardell Williams
Assistant

AW:db

Enclosures